NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12441

HOMEOWNER'S REHAB, INC., & another[1] vs.  RELATED
CORPORATE V SLP, L.P., & another.[2]


Suffolk.     February 6, 2018. - June 15, 2018.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Cypher, &
Kafker, JJ.


Partnership, Limited partnership, General partner, Consent of
     limited partner.  Housing.  Real Property, Right of first
     refusal.



     Civil action commenced in the Superior Court Department on
December 5, 2014.

     The case was heard by Janet L. Sanders, J., on a motion for
summary judgment, and entry of judgment was ordered by her.

     The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


     Dennis E. McKenna for the defendants.
     Karen E. Friedman (David E. Lurie also present) for the
plaintiffs.
     The following submitted briefs for amici curiae:
     Henry Korman & Daniel M. Rosen for Citizens' Housing and
Planning Association & others.

---

[1] Memorial Drive Housing, Inc.

[2] Centerline Corporate Partners V L.P.

W. Bart Lloyd, Gregory M. Katz, & Jonathan Klein for Preservation of Affordable Housing, Inc., & another.

Stephen M. Nolan for Massachusetts Housing Investment Corporation.

Roberta L. Rubin, Special Assistant Attorney General, & Bruce E. Falby for Department of Housing and Community Development & others.

Albert P. Zabin for Chinese Progressive Association, Inc., & another.

Charles R. Bennett for Holland & Hart LLP.

Christopher G. Caldwell, Michael D. Roth, & Kelly L. Perigoe, of California, & William C. Jackson for Jonathan Zasloff.

Christopher G. Caldwell, Michael D. Roth, & Kelly L. Perigoe, of California, & William C. Jackson for Bradley Myers.


GANTS, C.J.  The parties in this case are partners in a limited partnership formed for the purpose of rehabilitating and operating an affordable housing complex.  The project was eligible for financing under the Low Income Housing Tax Credit (LIHTC) program set forth in the Internal Revenue Code, 26 U.S.C. § 42 (2012).  Under the agreements executed in connection with this project, the majority owner of the general partner, a nonprofit organization, holds a right of first refusal to purchase the partnership's interest in the property "in accordance with" § 42(i)(7).  The primary issue in this case is when that right of first refusal may be exercised under the terms of these agreements.  The plaintiffs contend that the right of first refusal can be exercised once a third party makes an enforceable offer to purchase the property interest.  The defendants contend that the right of first refusal cannot be

exercised unless and until the partnership has received a bona fide offer from a third party, and has decided, with the consent of the special limited partner, to accept that offer.  The Superior Court judge in this case agreed with the plaintiffs, and granted their motion for summary judgment.  We affirm the grant of summary judgment.[3]

Background.  1.  The LIHTC program.  Because the limited partnership here was formed for the purpose of participating in the LIHTC program, we begin by describing the program.

As set forth in the Internal Revenue Code, 26 U.S.C. § 42, the LIHTC program is a Federal subsidy program designed to promote the construction and rehabilitation of rental housing that is affordable to low and moderate income households.  It is the most important source of financing for affordable housing in Massachusetts and across the nation.  See Joint Center for Housing Studies of Harvard University, America's Rental Housing: Expanding Options for Diverse and Growing Demand 32-33 (2015)

---

[3] We acknowledge the amicus briefs submitted in support of Homeowner's Rehab, Inc., by Preservation of Affordable Housing, Inc., and The Community Builders, Inc.; Citizens' Housing and Planning Association, Greater Boston Real Estate Board, and Massachusetts Association of Community Development Corporations; Massachusetts Department of Housing and Community Development, Massachusetts Development Finance Agency, Massachusetts Housing Partnership Fund Board, and Community Economic Development Assistance Corporation; Massachusetts Housing Investment Corporation; and Chinese Progressive Association, Inc., and Chelsea Collaborative, Inc.  We acknowledge the amicus briefs submitted in support of Related Corporate V SLP, L.P., by Bradley Myers, Jonathan Zasloff, and Holland & Hart LLP.

(LIHTC program now provides more affordable rental units than are provided in public housing or with Section 8 housing vouchers); Department of Housing and Community Development, Low Income Housing Tax Credit Program, 2018-2019 Qualified Allocation Plan 6 (since 1987, LIHTC program has helped finance over 67,000 affordable rental units in Massachusetts and almost 3 million nationwide).  Under § 42, tax credits are allocated to each State based on population; the States, in turn, allocate the tax credits to "qualified low-income housing projects" -- that is, residential rental properties that are rent-restricted and have a certain minimum share of rental units set aside for low and moderate income households.  See 26 U.S.C. § 42(g), (h)(3).[4]

The owners of these properties can claim the tax credits annually over a period of ten years, thereby offsetting their tax liability, but must continue to comply with rent affordability restrictions for a period of fifteen years, known as the compliance period, to avoid recapture of those credits. See 26 U.S.C. § 42(a), (c)(2), (f)(1), (i)(1), (j).  For any

---

[4] In order to qualify for tax credits under the Low Income Housing Tax Credit program, a property must meet one of two criteria:  either (1) at least twenty per cent of the units are rent-restricted and occupied by tenants with incomes that are at most fifty per cent of area median income (AMI), or (2) at least forty per cent of the units are rent-restricted and occupied by tenants with incomes that are at most sixty per cent of AMI.  26 U.S.C. § 42(g)(1).

LIHTC project allocated tax credits after 1989, the owner must also agree to comply with the affordability restrictions for an additional fifteen years, known as the extended use period, so that the affordability restrictions remain in place for a total of thirty years.  See 26 U.S.C. § 42(h)(6).

Developers of affordable housing projects frequently use the tax credits available under the LIHTC program as an incentive to attract capital from private investors.  Because these projects rarely generate enough tax liability for the developers to claim the full value of the credits themselves, and because many of these developers are nonprofit organizations and therefore tax-exempt, the tax credits are of little value to them.  By syndicating the project, however, these developers can "sell" the tax credits to private investors -- in most cases corporations with substantial and predictable tax liability -- in exchange for an equity investment in the project.  See J. Khadduri, C. Climaco, & K. Burnett, United States Department of Housing and Urban Development, What Happens to Low-Income Housing Tax Credit Properties at Year 15 and Beyond?, at 2 (2012) (Khadduri et al.); M.I. Sanders, Joint Ventures Involving Tax-Exempt Organizations 949-951 (4th ed. 2013).

Section 42 requires each State to set aside at least ten per cent of its allocable tax credits for projects developed and operated by qualified nonprofit organizations.  26 U.S.C.

§ 42(h)(5).  In a typical project of this kind, the property is owned by a limited partnership, formed solely for that purpose, in which the general partner is a nonprofit organization holding only a nominal equity interest (one per cent or less) and the limited partners are private investors who hold almost all of the equity (ninety-nine per cent or more).  The nonprofit general partner is responsible for the day-to-day management of the property.  The investor limited partners contribute capital and, in return, are allocated the tax benefits flowing from the project, including the LIHTC tax credits, deductions for depreciation, and other tax losses.  See Khadduri et al., supra at 11, 25; Mittereder, Pushing the Limits:  Nonprofit Guarantees in LIHTC Joint Ventures, 22 J. Affordable Hous. & Cmty. Dev. L. 79, 83 (2013) (Mittereder).

At the end of the fifteen-year compliance period, when all tax credits have been claimed and are no longer subject to recapture, most investor limited partners will seek to leave the project, usually -- but not always -- by selling their interest to the nonprofit general partner.  See Khadduri et al., supra at 29-31; Mittereder, supra at 83.  Section 42 specifically contemplates such sales, allowing nonprofit organizations to hold a right of first refusal to purchase the property at the end of the compliance period at a statutorily prescribed minimum price, and protecting investors against the risk that their tax

credits will be disallowed or recaptured for that reason.  Title 26 U.S.C. § 42(i)(7)(A) states:

> "No Federal income tax benefit shall fail to be allowable to the taxpayer with respect to any qualified low-income building merely by reason of a right of [first] refusal held by the tenants . . . or resident management corporation of such building or by a qualified nonprofit organization . . . to purchase the property after the close of the compliance period for a price which is not less than the minimum purchase price . . . ."

The "minimum purchase price" (§ 42 price) is an amount equal to the outstanding debt on the property, excluding debt incurred in the five years preceding the sale, plus exit tax liability,[5] and is typically below fair market value.  26 U.S.C. § 42(i)(7)(B).  See Khadduri et al., supra at 31.

Section 42 does not mandate that nonprofit organizations be granted a right of first refusal, but the Internal Revenue Service has issued guidance indicating that, in order to qualify for tax-exempt status, a nonprofit organization participating as a general partner in a LIHTC partnership must secure a right of first refusal to acquire the property at the end of the compliance period.  Memorandum from Robert S. Choi, Director of Exempt Organizations, Internal Revenue Service, Income Housing Tax Credit Limited Partnerships 1, 3-4 (July 30, 2007).

---

[5] Exit tax liability includes all Federal, State, and local taxes attributable to the sale of the property.  26 U.S.C. § 42(i)(7)(B)(ii).

2.  The agreements.  The parties here are partners in a limited partnership (partnership) created in 1997 to rehabilitate and operate an affordable housing complex in Cambridge (property) under the LIHTC program.  The general partner is Memorial Drive Housing, Inc., a corporation that is majority-owned and controlled by Homeowner's Rehab, Inc. (nonprofit developer), a nonprofit organization that specializes in the development of affordable housing.  The investor limited partners are Centerline Corporate Partners V L.P., as limited partner, and Related Corporate V SLP, L.P., as special limited partner.  The partnership owns a ninety-nine-year lease of the property (property interest).[6]

Pursuant to the partnership agreement, the limited partners made capital contributions of approximately $7 million.  The partnership agreement allocates 99.99 per cent of the tax credits -- as well as the profits and losses of the partnership, with some exceptions, and deductions for expenses, including depreciation expenses -- to the limited partners.

The partnership agreement requires that, for the fifteen-year compliance period, the property will comply with the affordability restrictions and other requirements of § 42.  In

---

[6] The property, consisting of both the land and the building, is owned by a charitable trust created by Homeowner's Rehab, Inc. (nonprofit developer), which is the sole beneficiary of the trust.

addition, the property is subject to certain long-term affordability restrictions negotiated with local and Federal housing authorities.

The partnership agreement also defines the rights and obligations of the respective partners. Section 5.1 vests "[t]he overall management and control of the business, assets[,] and affairs of the Partnership" in the general partner. The partnership agreement envisions only a limited managerial role for the limited partners, providing that neither "shall take part in the management or control of the business of the Partnership."

The parties also entered into another agreement (option agreement) outlining two potential mechanisms by which the nonprofit developer could acquire the property interest. The first mechanism is a right of first refusal, granted in accordance with § 42(i)(7). Under section 2 of the option agreement, the partnership cannot sell its interest in the property "without it first being offered" to the nonprofit developer; specifically, the partnership must deliver to the nonprofit developer a notice (disposition notice) that states, among other things, the third party "to whom the Partnership proposes to make such disposition," the price to be paid and "all other terms of the proposed disposition," and "a statement indicating whether the Partnership is willing to accept the

offer."  Upon receiving the disposition notice, the nonprofit developer can exercise its right of first refusal and acquire the property interest at a purchase price equal to "the lesser of" (1) the § 42 price, (2) the price that the third party would have paid in the proposed disposition, or (3) the "Restricted Market Price" (market price), meaning the fair market value, subject to certain restrictions encumbering the property.

The second mechanism by which the nonprofit developer can acquire the property interest is an option to purchase, which exists separately and "[i]n addition to [the] Right of First Refusal."  Under section 6 of the option agreement, for a period of four years commencing at the end of the fifteen-year compliance period, the nonprofit developer has an option to purchase the property interest at the market price.

The partnership agreement specifically references and incorporates the option agreement, which, as defined in the partnership agreement, is not limited to the option to purchase but also includes the provisions governing the right of first refusal.  Section 5.4 of the partnership agreement outlines the procedure for the sale of partnership assets, stating:

> "Except as may be otherwise expressly provided . . . in this Agreement, the General Partner[] . . . [is] hereby authorized to sell . . . all or substantially all of the assets of the Partnership; provided, however, that except for a sale pursuant to the Option Agreement, the terms of any such sale . . . must receive the Consent of the Special

> Limited Partner before such transaction shall be binding on the Partnership."

> That section further states:

> "The Partnership and [the nonprofit developer] agree that, with respect to the Option Agreement, it is their intention that the purchase price under the Option Agreement be the minimum price consistent with the requirements of [§] 42(i)(7) of the [Internal Revenue] Code."

Section 5.4 also sets forth an interpretation of certain terms in § 42(i)(7) that will govern the exercise of the right of first refusal "so long as [the nonprofit developer] provides evidence reasonably satisfactory to the Partnership and the Limited Partner that [such] interpretation[] will not adversely affect, or cause any material risk of recapture of, any Credits previously taken by such Limited Partner."

The closing documents to the agreements include a memorandum from the accounting firm Reznick Fedder & Silverman (Reznick memorandum) providing financial projections for the partnership over the fifteen-year compliance period. The Reznick memorandum also projected the return on investment the limited partners would receive if the property interest were to be sold at the end of the compliance period for a purchase price of one dollar plus outstanding debt; it estimated that, after cumulative tax savings of about $19 million, the limited partners would stand to receive approximately $10 million, which would be $3 million over their initial $7 million investment.

3.  The parties' dispute.  The following facts in the summary judgment record are not materially in dispute.

Over the fifteen-year compliance period, the limited partners claimed approximately $7.5 million in tax credits and over $24 million in tax losses through the partnership.  In January, 2014, after the compliance period had ended, the nonprofit developer offered to purchase the limited partners' interest in the property for one dollar, plus the assumption of outstanding debt, which it contended was the minimum price consistent with § 42(i)(7).  In March, 2014, the limited partners rejected the offer, claiming that the nonprofit developer could purchase the property interest at the § 42 price only if it were to exercise its right of first refusal, which it could not do because the conditions for exercising that right had not been satisfied.

Despite further negotiations, the parties were unable to agree upon a purchase price for the property interest, and were also unable to agree on their interpretation of the right of first refusal.

In the fall of 2014, the nonprofit developer decided to trigger its right of first refusal according to its own interpretation by soliciting a third-party offer from Madison Park Development Corporation (Madison Park), another nonprofit developer of affordable housing.  Peter Daly, executive director

for both the general partner and the nonprofit developer, asked the chief executive officer of Madison Park, Jeanne Pinado, to make an offer as a "favor" to him.  In November, 2014, Madison Park submitted a written offer to purchase the property interest for approximately $42 million.  Pinado understood that Daly had solicited the offer in order to trigger the right of first refusal.  She also knew that Madison Park's offer was subject to the nonprofit developer's right of first refusal, which the nonprofit developer was likely to exercise.  But Pinado testified that Madison Park had made "a good offer" that was "appropriate . . . for [the] property," and that, in the event that the nonprofit developer did not exercise its right of first refusal, Madison Park was willing and able to honor its offer.

Having received Madison Park's offer, the general partner, acting on behalf of the partnership, issued a disposition notice to the nonprofit developer and to the limited partners, stating that the partnership was "willing to accept the offer subject to consent of the Partnership's limited partner."  The notice also stated that the estimated market price for the property interest was $46 million.  In response, the special limited partner issued a notice stating that it did not consent to the proposed sale to Madison Park and that the general partner therefore lacked the authority to issue the disposition notice. Undeterred, the nonprofit developer issued a notice informing

the partnership that, having received the disposition notice, it intended to exercise its right of first refusal to purchase the property interest.

4. The action for declaratory judgment. Because it was apparent that the limited partners would continue to oppose the sale, the nonprofit developer and the general partner commenced an action against the limited partners in the Superior Court, seeking a declaratory judgment as to the parties' rights under the relevant agreements. In their answer, the limited partners asserted a counterclaim alleging that, by attempting to trigger the nonprofit developer's right of first refusal without the special limited partner's consent, the general partner had committed a breach of its fiduciary duty to the limited partners and the implied covenant of good faith and fair dealing.

Following discovery, the plaintiffs moved for summary judgment on their claims for declaratory relief and on the limited partners' counterclaim. The judge allowed the plaintiffs' motion as to all claims. The judge determined that the option agreement should not be read in isolation, but must instead be construed together with the partnership agreement, in keeping with the intent of the parties, and in the context of the statutory requirements of the LIHTC program. The judge concluded that under those agreements the general partner could solicit a third-party offer and issue a disposition notice --

thereby triggering the nonprofit developer's right of first refusal -- without the consent of the special limited partner.

In reaching this conclusion, the judge pointed to two specific provisions in the agreements. First, the judge noted that, under section 2 of the option agreement, the disposition notice must state "whether the Partnership is willing to accept the [third-party] offer" (emphasis added), indicating that "the offer need not be accepted by the Partnership . . . in order to trigger the [right of first refusal]." Second, the judge also noted that, under section 5.4 of the partnership agreement, the general partner need not obtain the consent of the special limited partner for a sale "pursuant to the Option Agreement." The judge interpreted this to mean that the general partner need not obtain such consent before soliciting an offer or before issuing a disposition notice to trigger the right of first refusal.

The judge also rejected the limited partners' contention that Madison Park's offer was not a bona fide offer and therefore could not trigger the right of first refusal. Emphasizing that the nonprofit developer's right of first refusal was "not a typical right of first refusal but rather a statutorily defined one designed to allow non-profit entities to buy back property . . . at a preset price," the judge concluded

that the right could be triggered by any enforceable third-party offer and that Madison Park's offer qualified as such.

The judge concluded that this interpretation "would not deprive the defendants of the benefit of their bargain," finding, based on the Reznick memorandum, that the limited partners' expected benefit from their investment was limited to the tax credits and other tax benefits -- which they did receive -- and did not include any residual value from the property in the event of a sale.

As to the limited partners' counterclaim, the judge concluded that because the general partner's actions were authorized by the agreements, there was no breach of fiduciary duty or of the covenant of good faith and fair dealing.

Accordingly, the judge issued a judgment declaring, inter alia, that the general partner was authorized to solicit an offer from Madison Park and to issue a disposition notice without the special limited partner's consent, that this disposition notice triggered the nonprofit developer's right of first refusal, that the general partner was authorized to sell the property interest to the nonprofit developer without the special limited partner's consent, and that the general partner did not commit a breach of its fiduciary duty to the limited

partners.  The limited partners appealed.[7]  We transferred the case to this court on our own motion.

Discussion.  We review a grant of summary judgment de novo to determine whether, viewing the evidence in the light most favorable to the nonmoving party (here, the defendant limited partners), the moving party (here, the plaintiff general partner and nonprofit developer) is entitled to judgment as a matter of law.  See Pinti v. Emigrant Mtge. Co., 472 Mass. 226, 231 (2015).  On appeal, the limited partners make three claims of error.  First, they claim that the judge erred in her interpretation of the agreements and that the right of first refusal cannot be exercised without the consent of the special limited partner.  Second, they claim that the judge impermissibly relied on extrinsic evidence, specifically the Reznick memorandum, in interpreting the agreements.  And third, they claim that the judge erred in concluding that the general partner had not committed a breach of its fiduciary duty to the limited partners or the implied covenant of good faith and fair dealing.

With respect to the agreements, the parties here agree that the partnership agreement and the option agreement incorporate

---

[7] On the limited partners' motion, the judge entered an order enjoining the general partner from selling the property interest under the option agreement pending the outcome of the limited partners' appeal.

each other by reference, and must be read together as an integrated whole.  See Phoenix Spring Beverage Co. v. Harvard Brewing Co., 312 Mass. 501, 505 (1942) ("[W]hen several writings evidence a single contract between the parties, they will be read together in order to arrive at an interpretation of the contract").  They also agree that these agreements were carefully negotiated and crafted by sophisticated parties, and that the language of these agreements is unambiguous -- although each side contends that that unambiguous language favors their own position.

The limited partners contend that the right of first refusal cannot be exercised unless triggered by a bona fide third-party offer, and then only if the partnership, with the special limited partner's consent, has agreed to accept that offer.  The general partner and nonprofit developer contend that the right can be triggered by any enforceable offer from a third party, and can be exercised when the general partner decides to accept it on behalf of the partnership, without the special limited partner's consent.  There are therefore three discrete issues that we must resolve:  first, whether the right of first refusal can only be triggered by a bona fide third-party offer; second, whether the partnership must decide to accept that offer in order for the nonprofit developer to exercise the right; and third, if so, whether the general partner is authorized to make

that decision on behalf of the partnership without the consent of the special limited partner.

Where both sides agree only that the language of the agreements is unambiguous, we must interpret that language in the context in which it was written and "with reference . . . to the objects sought to be accomplished," mindful that "a contract should be construed [so as] to give it effect as a rational business instrument and in a manner which will carry out the intent of the parties." Starr v. Fordham, 420 Mass. 178, 190, 192 (1995), quoting Shea v. Bay State Gas Co., 383 Mass. 218, 223 (1981), and Shane v. Winter Hill Fed. Sav. & Loan Ass'n, 397 Mass. 479, 483 (1986). Here, that context is § 42 of the Internal Revenue Code, which offers tax credits as an incentive to invest in affordable housing. The purpose of the partnership, as stated in section 2.5.A of the partnership agreement, is to "invest[] in real property and . . . provi[de] . . . low income housing." Participating in the LIHTC program serves the interests of all the partners, enabling the general partner to fulfil its mission of providing affordable housing, while providing the limited partners with a return on their investment, primarily in the form of tax credits allocated under § 42.

This mutuality of interest is reflected in the language of the agreements. The partnership agreement makes clear that the

amount of the limited partners' capital contributions was tied to the amount of tax credits allowable under § 42, which were allocated almost entirely to the limited partners. Many provisions in the agreement reflect the critical importance of ensuring that the limited partners obtain those credits. For example, section 5.2.B requires the general partner to "operate the [property] . . . in such a manner that [it] will be eligible to receive" tax credits with respect to a certain minimum percentage of units, while section 5.5.B(xv) prohibits the general partner from taking any action that would result in a disallowance or recapture of credits unless it obtains the special limited partner's consent. Other provisions reflect the importance of providing affordable housing in a manner that complies with all requirements of the LIHTC program. Section 2.5.A(v) authorizes the partnership to rent units "in accordance with applicable Federal, [S]tate[,] and local regulations, in such a manner so as to qualify for [tax credits]," while section 4.1.A requires the general partner to act in compliance with all applicable laws during the compliance period to ensure the allowance of tax credits and avoid their recapture.

We therefore examine the agreements with these mutual interests in mind. As earlier stated, the option agreement outlines two separate mechanisms by which the nonprofit developer can acquire the partnership's property interest: the

right of first refusal, and the option to purchase.  At common law, the distinction between these two forms of purchase rights is well established.  See, e.g., <u>Bortolotti</u> v. <u>Hayden</u>, 449 Mass. 193, 201 (2007); <u>Uno Restaurants, Inc</u>. v. <u>Boston Kenmore Realty Corp</u>., 441 Mass. 376, 382 (2004).  An option to purchase entitles the holder to purchase the property from the owner at a specific price; the holder can exercise it unilaterally, thereby compelling even an unwilling owner to sell.  See <u>Uno Restaurants, Inc</u>., <u>supra</u> at 382 & n.3.  See also 25 R.A. Lord, Williston on Contracts § 67:85, at 502 (4th ed. 2002).  In contrast, a right of first refusal is only a preemptive right, prohibiting the owner from selling the property to a third party "without first offering the property to the holder . . . at the third party's offering price."  <u>Uno Restaurants, Inc</u>., <u>supra</u> at 382.  The holder of the right may then decide whether to purchase the property by matching that price.  <u>Id</u>. at 383.  Also unlike an option to purchase, a right of first refusal cannot be exercised unilaterally, but can only be exercised where two conditions are met.  First, the right of first refusal must be triggered by "a bona fide and enforceable offer to purchase" the property, <u>Roy</u> v. <u>George W. Greene, Inc</u>., 404 Mass. 67, 69 (1989), meaning an offer that is made "honestly and with serious intent."  <u>Uno Restaurants, Inc</u>., <u>supra</u> at 383, quoting <u>Mucci</u> v. <u>Brockton Bocce Club, Inc</u>., 19 Mass. App. Ct. 155, 158 (1985).

Second, the owner of the property must have decided to accept that third-party offer.  See Bortolotti, supra at 204 (right of first refusal "arises only when a property owner receives, and is prepared to accept, a bona fide offer"); Roy, supra at 71 (right of first refusal can be exercised "only when the owner has decided to accept" third-party offer).  See also Williston on Contracts, supra ("[A] right of first refusal has no binding effect unless the offeror decides to sell").

The limited partners contend that, in granting the right of first refusal, the agreements here incorporate these common-law limitations on its exercise.  What they fail to acknowledge is that the right of first refusal in this case is not purely a creation of the common law but, as stated in the preamble to the option agreement, was granted "in accordance with [§] 42(i)(7) of the Internal Revenue Code," and must be understood in the context of agreements designed to secure tax credits under the LIHTC program.  Section 42(i)(7) provides that tax credits will not be withheld "merely" because a nonprofit organization holds "a right of [first] refusal . . . to purchase the property after the close of the compliance period for a price which is not less than" the statutorily prescribed, typically below-market § 42 price.  26 U.S.C. § 42(i)(7)(A).  Section 42(i)(7) provides a safe harbor for property owners, allowing them to grant such rights without disqualifying them from the tax credits that are

the key economic incentive for their investment in affordable housing.

This safe harbor is necessary because of a long-standing principle of tax law that limits the tax benefits attributable to property ownership -- including tax credits -- to the true owner of that property. See Frank Lyon Co. v. United States, 435 U.S. 561, 572-573 (1978). Under the economic substance doctrine, "the objective economic realities of a transaction," rather than its legal form, determine who is an owner for tax purposes. Id. at 573. See, e.g., Rev. Rul. 72-543, 1972-2 C.B. 87 (in sale-leaseback arrangement where "burdens and benefits of ownership" remain with seller, seller deemed owner for tax purposes). Traditionally, one of the core benefits of property ownership has been the right to profit from appreciation in value. See Dunlap v. Commissioner of Internal Revenue, 74 T.C. 1377, 1436-1437 (1980), rev'd and remanded on other grounds, 670 F.2d 785 (8th Cir. 1982). Thus, in many contexts, an option to purchase property at a below-market price -- which shifts the right to appreciation from the legal owner to the option holder -- is deemed to transfer ownership to the option holder, thereby disqualifying the legal owner from tax benefits. See, e.g., Rev. Rul. 55-540, 1955-2 C.B. 39, § 4.01(e) (transaction is sale, not lease, where there is "a purchase option at a price

which is nominal in relation to the value of the property").[8] Against this background, § 42(i)(7) serves to clarify that, notwithstanding traditional principles of tax law, a nonprofit organization's right of first refusal to acquire the property at the typically below-market § 42 price will not deprive the property owner of tax credits.[9]

By creating this safe harbor, § 42(i)(7) also furthers one of the key policy goals of the LIHTC program, which is to ensure that affordable housing remains affordable in the long term. Nonprofit organizations are more likely to continue to operate properties as affordable housing, even after the affordability restrictions are lifted, because it is their mission to do so. See Khadduri et al., supra at 41. Congress therefore designed § 42 to encourage nonprofit involvement, first by requiring at least ten per cent of tax credits to be allocated to projects

---

[8] For other examples where a below-market purchase option is deemed to transfer ownership for tax purposes, see 26 C.F.R. § 1.761-3(d) (2017) (where option to purchase partnership interest is "reasonably certain to be exercised," for example because of below-market strike price, option holder should be treated as partner); and Rev. Rul. 85-87, 1985-1 C.B. 268, 269 (where strike price is below fair market value of stock, put option is "in substance a contract to acquire stock").

[9] This clarification is especially important given that the Internal Revenue Service has stated in its regulations interpreting 26 U.S.C. § 42, that the tax credits available thereunder "may be limited or disallowed under . . . principles of tax law," including the "'economic substance' analysis" and the "'ownership' analysis" articulated in Frank Lyon Co. v. United States, 435 U.S. 561 (1978). 26 C.F.R. § 1.42-4(b) (2017).

involving nonprofit organizations, 26 U.S.C. § 42(h)(5), and second by facilitating the transfer of properties to nonprofit organizations through § 42(i)(7). Allowing the transfer of properties at below-market prices frees up cash flow, which nonprofit organizations can then use to preserve the properties as affordable housing into the future. See Khadduri et al., supra at 30.

The legislative history of § 42(i)(7) confirms that it was intended to facilitate the inexpensive transfer of properties to nonprofit organizations. See Report of the Mitchell-Danforth Task Force on the Low-Income Housing Tax Credit 19 (Jan. 1989) (Mitchell-Danforth Report). Lawmakers were concerned that properties financed under the LIHTC program would not remain affordable in the long term, because their owners would convert them to market-rate housing -- or sell them to third parties who would -- as soon as the affordability restrictions were lifted. See id. at 13. Their proposed solution was to make it easier for nonprofit organizations to purchase the properties. See id. at 19. Indeed, an earlier version of § 42(i)(7) would have allowed a nonprofit organization to hold an option to purchase the property at a below-market price.[10] S. 980, 101st Cong., 2d

---

[10] The 1989 amendments to § 42 were based in large part on the recommendations of the Mitchell-Danforth Task Force on the Low-Income Housing Tax Credit, which was formed to review the LIHTC program and make recommendations for its improvement.

Sess. (1989) (§ 2[y] of proposed bill). However, this version was rejected, apparently due to concerns that a below-market purchase option would, in substance, render the nonprofit organization the owner of the property and thereby run afoul of traditional rules of tax law. See Kaye, Sheltering Social Policy in the Tax Code: The Low-Income Housing Credit, 38 Vill. L. Rev. 871, 893 (1993).[11] Instead, Congress chose to enact a safe harbor only for a right of first refusal. See Pub. L. No. 101-239, Title VII, Subtitle A, § 7108(q), 103 Stat. 2321 (1989).[12] In so doing, Congress understood that a right of first

---

These recommendations became the basis for the Low-Income Housing Tax Credit Act of 1989, S. 980, 101st Cong., 2d Sess. (1989), which would have allowed nonprofit organizations to hold a below-market option to purchase. See Kaye, Sheltering Social Policy in the Tax Code: The Low-Income Housing Credit, 38 Vill. L. Rev. 871, 883-885 (1993) (Kaye).

The proposed language would have amended § 42(i) to include the following subsection (7): "[T]he determination of whether any qualified low-income building is owned by the taxpayer shall be made without regard to any option by a qualified nonprofit organization . . . to acquire such building at less than fair market value after the close of the compliance period . . . ." S. 980, 101st Cong., 2d Sess. (1989) (§ 2[y] of proposed bill).

[11] Professor Tracy A. Kaye, who served as tax legislative assistant to Senator John. C. Danforth, one of the leaders of the Mitchell-Danforth Task Force, later explained the decision to reject this initial version of § 42(i)(7), writing: "There was congressional concern that the grant of a below-market option . . . was a substantial enough relinquishment of one of the benefits of ownership such that true ownership was at issue." Kaye, supra at 871, 893.

[12] As originally enacted in 1989, § 42(i)(7) (then § 42[i][8]) allowed only tenants to hold a right of first

refusal -- in contrast to an option to purchase -- could not be exercised unilaterally by the holder. In the accompanying House committee report, the right of first refusal in § 42(i)(7) was described as a right to "purchase the building, for a minimum purchase price, should the owner decide to sell (at the end of the compliance period)." H.R. Rep. No. 101-247, 101st Cong., 1st Sess., at 1195 (1989). See Kaye, supra at 897 (Congress did not give nonprofit organizations "the power to compel an unwilling owner to sell"). Although in other contexts Congress has abrogated the traditional rule that tax benefits must follow ownership, in this case it chose not to make an exception. See id. at 893-894.[13]

Section 42(i)(7) therefore represents a compromise, facilitating the inexpensive transfer of property to nonprofit organizations, but in a way that does the least violence to the traditional rules of tax law. The right of first refusal described in § 42(i)(7) is not a typical right of first refusal,

---

refusal. Pub. L. No. 101-239, Title VII, Subtitle A, § 7108(q), 103 Stat. 2321 (1989). Congress later amended the provision to also allow tenant cooperatives, resident management corporations, and qualified nonprofit organizations to hold a right of first refusal. Pub. L. No. 101-508, Title XI, Subtitle D, § 11407(b)(1), 104 Stat. 1388-402 (1990). See Pub. L. No. 101-508, Title XI, Subtitle G, § 11701(a)(10) 104 Stat. 1388-507.

[13] In fact, Congress is currently considering an amendment to § 42(i)(7) that would replace "a right of [first] refusal" with "an option." S. 548, 115th Cong., 1st Sess., Title III, § 303 (2017).

for the obvious reason that it favors the nonprofit organization with a statutorily prescribed, often below-market price.  At common law, a right of first refusal allows the holder to purchase the property only by matching the price offered by a third party.  See Bortolotti, 449 Mass. at 201.  In contrast, a right of first refusal under § 42(i)(7) allows the holder to purchase the property at the § 42 price, even if it is far below the third-party offer.  See Bortolotti, supra (distinguishing between typical right of first refusal and "fixed price right of first refusal").  Yet, a right of first refusal under § 42(i)(7) is not completely unanchored from its common-law meaning.  In enacting § 42(i)(7), Congress relied on the common-law distinction between an option to purchase, which can be unilaterally exercised, and a right of first refusal, which cannot.  Congress specifically chose to allow one but not the other, recognizing that a right of first refusal -- which cannot be exercised until the owner decides to sell -- is for that very reason a less serious curtailment on ownership rights.

With this statutory background in mind, we now turn to the right of first refusal at issue here.  It is important to remember that, although § 42(i)(7) permits a nonprofit organization to hold a right of first refusal, it does not mandate such a right.  Here, the parties specifically chose to include a right of first refusal in the option agreement.  It is

also important to note that the right of first refusal here is even more generous to the holder than § 42(i)(7), because it allows the nonprofit developer to acquire the property at a price equal to the lesser of the § 42 price, the price offered by the third party, and the market price. Consequently, in the event that the third-party price or the market price is lower than the § 42 price, the nonprofit developer can purchase the property at the most favorable price.

1. Bona fide offer. The first issue we must consider is whether the right of first refusal can only be triggered by a bona fide offer. Although the agreements are silent on this issue, we conclude that such a limitation would be inconsistent with the statutory scheme of § 42 and with the specific terms of the agreements. See Roy, 404 Mass. at 70 (term "right of first refusal" understood to require bona fide offer "unless the context of the agreement dictates otherwise"). Because a right of first refusal granted under § 42(i)(7) -- like the one here -- allows the nonprofit organization to purchase the property at a below-market price, even if it is lower than the price offered by the third party, it is difficult to imagine why a third party would make a bona fide offer for the property, knowing that the nonprofit organization has this right and is likely to exercise it. See Bortolotti, 449 Mass. at 204 (fixed-price right of refusal "would burden the property by discouraging bona fide

offers").  With a typical right of first refusal, a third party can still prevail against the holder by overbidding -- that is, by offering a price so high that it cannot be matched.  But a right of first refusal under § 42(i)(7) eliminates even that possibility, because the holder need not match the third-party price.  To condition the right of first refusal on a bona fide offer, then, would mean that it would almost never be triggered. We decline to interpret the agreements in a way that would so obviously contravene the purpose of § 42(i)(7).  We therefore conclude, as the judge did, that the right of first refusal here need not be triggered by a bona fide offer, and requires only that the partnership have received an enforceable offer from a third party.  See Roy, supra (right of first refusal not triggered until "owner has received an enforceable offer").  We also agree with the judge that there is nothing in the agreements that bars the general partner from soliciting such offers.

2.  Partnership's decision to accept the offer.  The second issue we consider is whether, having received an offer from a third party, the partnership must decide to accept that offer in order for the nonprofit developer to exercise its right of first refusal.  Section 2 of the option agreement states that, before the right of first refusal can be exercised, the partnership must deliver to the nonprofit "notice of an offer to purchase"

from a third party.  This disposition notice must state, among other things, "whether the Partnership is willing to accept the offer" (emphasis added).  The judge interpreted this language to mean that the partnership need not have decided to accept the offer in order to trigger the right of first refusal.  We disagree with this interpretation because it effaces the common-law distinction between a right of first refusal and an option to purchase, which, as discussed, Congress relied upon when it enacted § 42(i)(7).  A right of first refusal cannot be exercised unless the owner of the property (here, the partnership) has decided to accept the third party's offer.  The decision to accept does not constitute an acceptance of the offer -- it need not be communicated to the third party -- but a decision must be made.  See Roy, 404 Mass. at 71.  This is why a right of first refusal does not run afoul of traditional tax principles, and why Congress chose to allow a right of first refusal rather than an option to purchase.  Where the agreement was intended to operate "in accordance with" § 42(i)(7), we must interpret its provisions consistently with Congressional intent, and Congress intended for nonprofit organizations to exercise their right of first refusal only when "the owner decide[s] to sell."  H.R. Rep. No. 101-247, supra at 1195.  We therefore conclude that the right of first refusal here cannot be

exercised unless the partnership decides to accept an offer from a third party.[14]

3. <u>Authority of the general partner to decide to accept the offer</u>. The third issue is whether the general partner has the authority to decide to accept the third-party offer on behalf of the partnership, without the limited partners' consent. The limited partners contend that the general partner does not have such authority, and that the special limited partner must consent before the partnership can decide to accept an offer or issue a disposition notice that would trigger the right of first refusal. In effect, this would mean that the nonprofit developer cannot exercise its right of first refusal without the limited partners' consent. If this were the case, one would expect that the limited partners would withhold their consent unless they were willing to sell the property interest at the § 42 price. But, if they were in fact willing to sell the property interest at that price, they would have no reason

---

[14] While it is true that the disposition notice must state "<u>whether</u> the Partnership is willing to accept the offer," not <u>that</u> it is, we note that this is not the only instance where the parties chose to use the word "whether," when the word "that" would have been more appropriate. For example, section 4 of the option agreement states that, in order to exercise its right of first refusal, the nonprofit developer must issue a "Purchase Notice" stating, among other things, "<u>whether</u> the [nonprofit developer] intends to exercise the Right of First Refusal" (emphasis added) -- even though there would be no need to issue a "Purchase Notice" unless the nonprofit developer did, in fact, intend to exercise the right.

to wait for a third-party offer to trigger the right of first refusal; they could simply sell to the nonprofit developer at that price. Consequently, if we were to interpret the right of first refusal to require the consent of the special limited partner, the nonprofit developer could be denied any meaningful opportunity to acquire the property interest at the § 42 price. In cases where the limited partners are unwilling to sell at the § 42 price, the nonprofit developer would be able to purchase the property only by exercising its option to purchase at the market price. Moreover, because both the right of first refusal and the option to purchase were set to expire four years after the end of the fifteen-year compliance period, the nonprofit developer would have had to exercise its option to purchase before then or lose the right to purchase the property interest at any price without the consent of the special limited partner.

The limited partners contend that this is precisely what was agreed to and expressed in the unambiguous language of the agreements, which would mean that -- contrary to the congressional intent behind § 42(i)(7), to facilitate the inexpensive transfer of properties to nonprofit organizations -- the parties had negotiated an agreement that could bar the nonprofit developer from ever purchasing the property at a favorable price. But that is not what is reflected in the language of the agreements.

As stated, the partnership agreement confers broad powers on the general partner, while circumscribing the powers of the limited partners. The partnership agreement identifies only a few actions that the general partner cannot take without the consent of the special limited partner. Of relevance here, section 5.5.B(iv) prohibits the general partner from "sell[ing] all or any portion" of the property, "except with the Consent of the Special Limited Partner." This prohibition is "subject to the provisions contained in Section 5.4," which grant the general partner the authority to sell "all or substantially all of the assets of the Partnership; provided, however, that except for a sale pursuant to the Option Agreement, the terms of any such sale . . . must receive the Consent of the Special Limited Partner before such transaction shall be binding on the Partnership."

The limited partners concede that, under section 5.4, the special limited partner need not consent to the terms of a sale if the sale is pursuant to the option agreement, for example where the nonprofit developer has exercised its right of first refusal. The limited partners nevertheless contend that the special limited partner must consent to the terms of a sale if the sale is to a third party, which is what triggers the right of first refusal, before the general partner can issue a disposition notice. But section 5.4 states only that the

special limited partner must consent to the terms of a sale "before such transaction shall be binding on the Partnership." As stated, the decision to accept a third-party offer does not itself constitute an acceptance of the offer. Thus, the mere issuance of a disposition notice does not bind the partnership to sell to the third party or even to accept its offer if the nonprofit developer were for some reason to fail to exercise its right of first refusal. Section 5(a) of the option agreement provides that, if the nonprofit developer fails to exercise its right of first refusal, the partnership "may thereupon consummate the sale to the [third party] upon the terms of the offer" (emphasis added). Section 5(a) specifically recognizes the possibility that the partnership will not consummate the sale, and provides in such an event that the nonprofit developer's right of first refusal would then apply to any subsequent third-party offer. To be sure, the partnership could not consummate a sale to a third party without the consent of the special limited partner, but that does not mean that the special limited partner must consent to the terms of an offer before the disposition notice can be issued.

Because the issuance of the disposition notice does not bind the partnership to sell to a third party, and because a sale pursuant to the option agreement is specifically excluded from the requirement of consent by the special limited partner,

we look to other provisions of the partnership agreement to see if there is any restriction on the general partner's authority to issue the disposition notice. The only relevant restriction is contained in section 5.5.B(xv), which prohibits the general partner from taking any action that would threaten the limited partners' tax credits. In order to secure the tax credits, the partnership must continue to own the property interest throughout the compliance period. Moreover, the safe harbor under § 42(i)(7) provides that the right of first refusal can be exercised only "after the close of the compliance period." 26 U.S.C. § 42(i)(7)(A). Thus, although the option agreement allows the nonprofit developer to exercise its right of first refusal at any time during the first nineteen years of the project, including during the compliance period, section 5.5.B(xv) effectively prohibits the general partner from triggering that right during the compliance period. Once the compliance period has ended, however, there is nothing in the partnership agreement that restricts the general partner's authority to issue a disposition notice, or that requires it to obtain the consent of the special limited partner before issuing such notice.

Examining the language of the agreements in their statutory and practical context, we conclude that the general partner is authorized to trigger the nonprofit developer's right

of first refusal by soliciting an enforceable offer from a third party and, upon receipt of such an offer, issuing a disposition notice if the general partner has decided, on behalf of the partnership, to accept the offer.  In reaching this conclusion, we emphasize that we are only interpreting the language of the agreements that the parties executed here.  We are not declaring that every partnership participating in the LIHTC program must permit a right of first refusal that can be exercised under these circumstances.  We have stated that, unless otherwise negotiated between the parties, a right of first refusal granted in accordance with § 42(i)(7) can only be exercised, consistent with congressional intent, when the owner of the property has made a decision to accept an enforceable third-party offer.  Where the owner of the property is a limited partnership, how the partnership makes that decision is a matter of contract. The parties are of course free to negotiate a different allocation of rights under their partnership agreement, or a different mechanism for triggering the right of first refusal.[15]

---

[15] Of course, any such agreement would have to conform to the requirements of § 42 and related regulations in order to ensure the allowance of tax credits.  The limited partners and amici have suggested that, if a nonprofit organization were to hold a right of first refusal that it could exercise unilaterally, this would raise doubts about the ownership of the property and potentially preclude the investor limited partners from receiving their tax credits.  We do not express a view as to whether this is true.  Our task here is to interpret the

For example, they may include language in their agreements requiring the consent of the investor limited partners before any right of first refusal is triggered.[16]  The parties here did not include any such language in their agreements, and we must enforce the language they chose.

We also note that we reach this conclusion without any reference to the Reznick memorandum.  Because our review of a decision to grant summary judgment is de novo, we need not determine whether the judge erred in considering that memorandum.  We recognize that a court may consider extrinsic evidence only when the meaning of the contract is ambiguous, because "extrinsic evidence cannot be used to contradict or

---

agreements before us, not to opine on the risk of unintended tax implications.

[16] We doubt that parties will often negotiate such provisions, because nonprofit developers will be reluctant to accept provisions that would effectively deny them a meaningful opportunity to acquire the property at a favorable price.  Moreover, it is usually in the investor limited partners' economic interest to leave the project at the end of the compliance period.  The primary economic benefit to the limited partners is in the form of tax credits, and most LIHTC properties, because they are subject to long-term affordability restrictions, have little residual value beyond debt.  See J. Khadduri, C. Climaco, & K. Burnett, United States Department of Housing and Urban Development, What Happens to Low-Income Housing Tax Credit Properties at Year 15 and Beyond?, at 31 (2012).  Unsurprisingly, studies have shown that in the majority of LIHTC projects, the limited partners willingly leave at the end of the compliance period by transferring the property to the general partner, often for little or no consideration over outstanding debt.  See id. at 29-31; Mittereder, Pushing the Limits:  Nonprofit Guarantees in LIHTC Joint Ventures, 22 J. Affordable Hous. & Cmty. Dev. L. 79, 83 (2013).

change the written terms, but only to remove or to explain the existing uncertainty or ambiguity." General Convention of the New Jerusalem in the U.S. of Am., Inc. v. MacKenzie, 449 Mass. 832, 836 (2007).

Finally, we also conclude that the judge correctly granted summary judgment to the plaintiffs on the defendants' counterclaim alleging that the general partner committed a breach of its fiduciary duty to the limited partners as well as the implied covenant of good faith and fair dealing. Because the contours of fiduciary duties are defined with reference to the terms of the contract, there can be no claim for a breach of fiduciary duty where a partner's "contested action falls entirely within the scope of a contract" between the partners. Fronk v. Fowler, 456 Mass. 317, 331-332 (2010), quoting Chokel v. Genzyme Corp., 449 Mass. 272, 278 (2007). Nor can the covenant of good faith and fair dealing "be invoked to create rights and duties not otherwise provided for in the existing contractual relationship." Uno Restaurants, Inc., 441 Mass. at 385. The only contested action here was the solicitation of an offer from Madison Park and the issuance of the disposition notice. Because the general partner was authorized to take these actions under the terms of the agreements, we conclude that these actions, without more, cannot constitute a breach of

fiduciary duty or of the covenant of good faith and fair dealing.[17]

Conclusion. The judgment arising from the allowance of the plaintiff's motion for summary judgment is affirmed.

So ordered.

---

[17] In so holding, we emphasize that the general partner here sought to trigger the right of first refusal only so that the nonprofit developer could purchase the property interest at a price not less than the § 42 price. This was in line with the parties' intention, which, as stated in the partnership agreement, was for the purchase price under the option agreement to be "the minimum price consistent with the requirements of [§] 42(i)(7)." However, the option agreement also allows the nonprofit developer to purchase the property interest at the price offered by the third party if it is lower than the § 42 price or the market price. Reading the option agreement in isolation, this would mean that the general partner could theoretically solicit a third-party offer at an artificially discounted price, lower even than the § 42 price, and that the nonprofit developer could then exercise its right of first refusal at that discounted price. In such cases, the general partner may be constrained by its fiduciary duty to the limited partners. Here, however, there is no allegation that the offer from Madison Park was artificially discounted. Moreover, the nonprofit developer has stated that, in exercising its right of first refusal, it intends to purchase the property interest by assuming the total amount of outstanding debt, for an amount that exceeds both Madison Park's offer and the § 42 price.