SUPREME JUDICIAL COURT 
 
 TENANTS' DEVELOPMENT CORPORATION & another[1] vs. AMTAX HOLDINGS 227, LLC, & others [2]

 
 Docket:
 SJC-13564
 
 
 Dates:
 September 9, 2024 - January 13, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, & Wolohojian, JJ.
 
 
 County:
 Suffolk
 

 
 Keywords:
 Partnership, Limited partnership, Consent of limited partner, Agreement, Fiduciary duty. Housing. Real Property, Right of first refusal, Sale. Contract, Performance and breach, Construction of contract, Implied covenant of good faith and fair dealing, Interference with contractual relations. Sale, Real estate. Declaratory Relief. Practice, Civil, Declaratory proceeding, Summary judgment
 
 

             Civil action commenced in the Superior Court Department on June 17, 2020.
            The case was heard by Peter B. Krupp, J., on motions for summary judgment.
            The Supreme Judicial Court granted an application for direct appellate review.
            David A. Davenport, of Minnesota (Laura L. Mittelman also present) for Tenants' Development Corporation & another.
            Louis E. Dolan, Jr., of the District of Columbia, (Sarah L. Tufano, of New York, & Stephen M. LaRose also present) for AMTAX Holdings 227, LLC, & others.
            The following submitted briefs for amici curiae:
            Christopher Jee, Special Assistant Attorney General, Stephen M. Nolan, & Vanessa Carnes for Executive Office of Housing and Livable Communities & others.  
            Dwayne W. Barrett & Calogero S. Nocera, of Tennessee, Efrem Levy, of the District of Columbia, & Stephen I. Holmquist for The Community Builders, Inc., & others.
            Matthew J. Segal & Jamie L. Lisagor, of Washington, & Erica Coray for Washington State Housing Finance Commission.
            WOLOHOJIAN, J.  The parties are partners in a limited partnership formed for the purpose of developing and operating an affordable housing project (property) in the South End section of Boston.  The property's financing and structure is driven by a Federal tax program designed to help nonprofit organizations rehabilitate and operate affordable housing properties while creating an incentive in the form of tax credits to private investors willing to invest in them.  This is known as the Low Income Housing Tax Credit program (LIHTC program).  See Internal Revenue Code, 26 U.S.C. § 42.  With respect to the property at issue here, the parties entered into various agreements designed to conform to the LIHTC program, including a partnership agreement and a right of first refusal held by the nonprofit general partner.  In essence, this case turns on two questions regarding the interpretation of those agreements.  The first is whether the partnership agreement gives the investor limited partner a consent right over a sale to the nonprofit general partner pursuant to its right of first refusal.  The second is whether the general partner's purchase price under the right of first refusal must include the limited partners' exit tax liability.  Ruling on cross motions for summary judgment, a Superior Court judge concluded that the answer to the first question was "no," and the answer to the second was "yes."  We affirm.[3]
            Background.  The LIHTC program was created as a part of the Tax Reform Act of 1986.  Pub. L. No. 99-514, § 252, 100 Stat. 2085, 2189–2208 (codified, as amended, at 26 U.S.C. § 42).  It is the primary mechanism through which the Federal government encourages the development and rehabilitation of low income housing.  M.P. Keightley, Cong. Research Serv., RS22389, An Introduction to the Low-Income Housing Tax Credit 1 (2023).  See H.R. Rep. No. 101-247, 101st Cong., 1st Sess., at 1188 (1989).  See also Homeowner's Rehab, Inc. v. Related Corporate V SLP, L.P., 479 Mass. 741 (2018) (HRI).  The LIHTC program is designed to create incentives for two sets of actors:  developers of low income housing, and investors who might not otherwise be willing to provide equity for the development and rehabilitation of such properties.  Keightley, at 1.  The program is regulated at the Federal level, and credits are allocated to each State based on population.  26 U.S.C. § 42(h)(3)(C).  Those tax credits are then distributed by State housing credit agencies according to a qualified allocation plan (QAP).  26 U.S.C. § 42(m)(1)(A)(i).  Each State's QAP sets out criteria that reflect the State agency's housing priorities.  Section 42 also directs States to allocate at least ten percent of the credits to "qualified low-income housing projects."  26 U.S.C. § 42(h)(5)(A).  "Qualified low-income housing projects" are those where a "qualified nonprofit organization[4] . . . own[s] an interest in the project (directly or through a partnership) and materially participate[s] . . . in the development and operation of the project throughout the compliance period."  26 U.S.C. § 42(h)(5)(B). 
            Owners of qualified low income housing projects can claim the tax credits annually over a ten-year period, thereby offsetting their own tax liability, 26 U.S.C. § 42(a), (f)(1), provided they comply with rent affordability restrictions for a fifteen-year period (the "compliance period"), 26 U.S.C. § 42(c)(2), (i)(1).[5]  Failure to comply for the duration of the compliance period can result in recapture of the tax credits by the Internal Revenue Service.  26 U.S.C. § 42(j).  
            Generally speaking, low income housing projects do not generate sufficient tax liability for developers to claim the full value of the tax credits and, moreover, many developers are tax exempt nonprofit entities for whom the credits hold no value.  J. Khadduri, C. Climaco, & K. Burnett, United States Department of Housing and Urban Development, What Happens to Low-Income Housing Tax Credit Properties at Year 15 and Beyond?, at 25 (2012) (Khadduri et al.).  Therefore, the tax credits are usually used to attract private investors who might not otherwise be inclined to invest in low income housing.  Id.  The nonprofit developer sells the tax credits to the private investors, who, in exchange, receive an equity interest in the project.[6]  Id.
            A typical project designed to take advantage of the LIHTC program takes the following path.  A limited partnership is formed for the sole purpose of owning the property, with ownership of the partnership divided between a general partner (often a nonprofit organization) holding a minority interest, and one or more limited partners holding the majority interest.  Id.  At the end of the fifteen-year compliance period, the limited partners will have used their tax credits and will no longer be at risk of recapture.  Id. at 29.  For this reason, limited partners are most likely to divest themselves of their interest at the fifteen-year mark, typically by selling their interest to the general partner, who stays on as the owner and manager of the property.  Id. 
            From the outset of an LIHTC project, the parties will have their eyes on the limited partners' exit strategy at the end of the compliance period.  See id. at 29.  Where, as here, the general partner is a nonprofit, "a right of first refusal is often granted up front to the nonprofit sponsor for the exit price specified in the federal tax code."  Khadduri et al., at 31.  See Report of the Mitchell–Danforth Task Force on the Low–Income Housing Tax Credit 19 (Jan. 1989) (Mitchell–Danforth Report) (exit scheme based on nonprofit holding right of first refusal intended to facilitate easy and inexpensive transfer back to nonprofit developer at close of compliance period).[7]  Section 42 anticipates and allows for such a right of first refusal and eliminates certain adverse consequences that might otherwise flow from it.  Specifically, by specifying that a nonprofit organization holding a right of first refusal will not be treated as the owner of the property for tax purposes,[8] Congress has ensured that the investors will not be prevented from receiving the tax credits. 
"No Federal income tax benefit shall fail to be allowable to the taxpayer with respect to any qualified low-income building merely by reason of a right of 1st refusal held by the tenants (in cooperative form or otherwise) or resident management corporation of such building or by a qualified nonprofit organization (as defined in subsection [h][5][C]) or government agency to purchase the property after the close of the compliance period for a price which is not less than the minimum purchase price determined under subparagraph (B)."
26 U.S.C. § 42(i)(7)(A).  Second, unlike a typical right of first refusal, which requires the holder to match a third-party offer, see Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 382 (2004), a qualified nonprofit organization may hold a right of first refusal under the LIHTC program at a below-market minimum price.
"For purposes of subparagraph (A), the minimum purchase price under this subparagraph is an amount equal to the sum of . . . (i) the principal amount of outstanding indebtedness secured by the building (other than indebtedness incurred within the 5-year period ending on the date of the sale to the tenants), and (ii) all Federal, State, and local taxes attributable to such sale."
26 U.S.C. § 42(i)(7)(B).  See Khadduri et al., at 31.  This price is commonly referred to as "debt plus taxes."  SunAmerica Hous. Fund 1050 v. Pathway of Pontiac, Inc., 33 F.4th 872, 881 (6th Cir. 2022).  AMTAX Holdings 227, LLC v. Tenants' Development II Corp., 15 F.4th 551, 557 (1st Cir. 2021).  
            We now turn to the facts of this case, which we draw from the parties' statement of undisputed material facts and the exhibits accompanying it.  Coplaintiff Tenants' Development Corporation (TDC) acquired the property[9] from the Boston Redevelopment Authority in 1973, and the property was subsequently structured and organized to take advantage of the LIHTC program.  TDC is a tax-exempt nonprofit entity under § 501(c)(3) of the Internal Revenue Code, founded in 1968 to preserve, maintain, and increase safe and affordable housing options for low and moderate income individuals.  TDC is the parent of coplaintiff Tenants' Development II Corporation (TDII).
            TDII is the managing general partner (general partner) of Tenants' Development II, LP (partnership), a limited partnership organized in 2002 to acquire, develop, own, and manage the property as affordable rental housing.  At all relevant times, the partnership was governed by a partnership agreement dated June 20, 2003.  The partnership agreement admitted defendant AMTAX Holdings 227, LLC (AMTAX), as an investor limited partner.[10]  Codefendant Tax Credit Holdings III, LLC (TCH), was subsequently admitted as the special limited partner (collectively, the limited partners).  Codefendant Alden Torch Financial LLC (Alden) owns TCH through a wholly owned affiliate entity, and manages the limited partners' interests in the partnership.  AMTAX, as the investor limited partner, holds a 99.99 percent interest in the partnership; TCH, as special limited partner, holds a .001 percent interest; and TDII, as general partner, holds a .009 percent interest.  At the same time as the parties executed the partnership agreement, TDC and the partnership executed a right of refusal and purchase option agreement (ROR agreement).  Under the ROR agreement, the partnership gave TDC a continuing right of first refusal "to purchase the [p]roperty in the event [the partnership] proposes to sell, transfer, assign, or ground lease all or substantially all [of the partnership's] interest therein."  In the event "of any proposed sale to a bona fide third party purchaser," the partnership was to deliver to TDC a written notice of sale (disposition notice) setting out all material terms of the proposed sale, including the name and address of the proposed purchaser, the sales price, and whether any seller financing was offered.  TDC then had thirty days to deliver a notice stating it intended to exercise its right of first refusal.
            Notably, the ROR agreement does not require TDC to match the terms offered by the bona fide third-party purchaser.  Instead, consistent with the provisions of the LIHTC program, see 26 U.S.C. § 42(i)(7)(B), the ROR agreement permits TDC to purchase the property for the lesser of
"the price stated in the [d]isposition [n]otice, or
". . . the sum of the principal amount of outstanding indebtedness secured by the [p]roperty (other than indebtedness incurred within the 5-year period ending on the date of any sale to [TDC] and all federal, state and local taxes attributed to such sale."
The ROR was recorded at the registry of deeds on August 4, 2003.
            Fifteen years later, on December 31, 2018, the compliance period for the property ended.  Not long thereafter, Alden exercised its right under the partnership agreement to force a sale of the property and sent TDII a written request that it "promptly use [its] best efforts to obtain a buyer for the [property] on the most favorable terms available."  TDII acknowledged receipt of this letter and took the steps necessary to market and list the property, including retaining a broker.
            In December 2019, after the listing agreement had been signed, Alden attempted to rescind its instruction to sell the property, claiming that it had not previously been aware of the ROR agreement –- a claim the defendants no longer press.  The partnership continued its marketing efforts and, on February 10, 2020, sent a disposition letter to TDC containing the terms of a $51 million offer from a bona fide third-party purchaser.  Consistent with the ROR agreement, the disposition letter notified TDC that, if TDC wished to exercise its right of first refusal, it would need to pay the lesser of the third-party offer or the debt plus taxes amount, which the partnership calculated as $17,108,380.  This latter figure did not include any amount for the limited partners' exit taxes, even though the partnership's accountants had calculated them as $5,382,990.[11]
            On the following day, TDC notified the partnership that it was exercising its right of first refusal at the debt plus taxes amount reported to it by the partnership.  The sale to TDC on those terms was preliminarily approved by the Massachusetts Housing Finance Agency (MassHousing).  
            In response to these developments, AMTAX recorded at the registry of deeds a "notice of consent rights" claiming that it had not consented to any disposition of the property, and stating that any attempted transfer of the partnership's interest would violate AMTAX's consent rights.[12]  Citing the notice and the dispute between the parties over whether AMTAX's consent to the sale was required, MassHousing then withheld final approval of the sale to TDC. 
            This suit followed, with the plaintiffs asserting claims for declaratory judgment, tortious interference with contract, violation of G. L. c. 93A, slander of title, and breach of contract and the implied covenant of good faith and fair dealing.  The defendants asserted counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, aiding and abetting breach of fiduciary duties, tortious interference with contract, declaratory judgment, and violation of G. L. c. 93A.  
            Ultimately, the parties filed cross motions for summary judgment, which the Superior Court judge allowed in part and denied in part.  In a thoughtful and comprehensive memorandum of decision, the judge concluded that AMTAX's consent was not required either for the partnership to propose a sale to a bona fide third-party purchaser or in connection with TDC's exercise of its right of first refusal.  However, the judge also concluded that the limited partners' exit taxes incurred as a result of the sale to TDC were required to be included in the debt plus taxes purchase price.  Finally, the judge concluded that the parties' remaining claims and counterclaims failed either as a consequence of his rulings regarding the partnership agreement and the ROR agreement or because of lack of evidentiary support in the summary judgment record.  After the judge's decision, the parties informed the judge that they did not seek to have the judge calculate the amount of the exit tax liability, and final judgment entered.  These cross appeals followed.
            Discussion.  Although the parties raise arguments concerning all of the claims and counterclaims, we begin our discussion by focusing on the contract issues because, at bottom, the outcome of the various causes of action rests on the interpretation of the partnership agreement and the ROR agreement.  As to the partnership agreement, the parties dispute whether AMTAX's consent was required for the sale of the property to TDC pursuant to the ROR agreement.  As to the ROR agreement, the parties dispute whether the limited partners' exit taxes were "attributable to" the sale of the property to TDC such that the exit taxes must be included in the purchase price under the terms of the ROR agreement.  These arguments do not turn on disputed facts, but rather on interpreting contractual provisions the parties contend are unambiguous.[13]  Our review is de novo.  See Allstate Ins. Co. v. Bearce, 412 Mass. 442, 446-447 (1992) (interpretation of written contractual provisions is question of law reviewed de novo on appeal from ruling on summary judgment).  
            Although the partnership agreement and the ROR agreement are separate documents, we read them as an integrated whole because they were entered into at the same time, incorporated each other by reference, used common defined terms, and were part of a single transaction designed to keep the property within the LIHTC program and to obtain that program's benefits.  See HRI, 479 Mass. at 751.  In a nutshell, those benefits included (a) allowing TDC to fulfill its mission of providing affordable housing, (b) allowing AMTAX to receive a return on its investment, largely in the form of tax credits allocated under the LIHTC program, without risk of recapture after the compliance period, (c) allowing AMTAX to exit the partnership after the compliance period by instructing the partnership to sell the property, and (d) giving TDC a right of first refusal allowing it to buy the property at a below-market price.  We "examine the agreements with these mutual interests in mind," and also keeping in mind their context, which is the LIHTC program.  Id. at 752.
            1.  Consent to sale.  The defendants argue that article III(C) of the partnership agreement requires that AMTAX's consent be obtained for any sale of the property, as well as to the terms of any sale, subject only to the condition that consent not be unreasonably withheld[14]:
"The [p]artnership . . . may sell . . . all or substantially all the assets of the [p]artnership; provided, however, that the terms of any such . . . sale . . . must receive the [c]onsent of [AMTAX] before such transaction shall be binding on the [p]artnership."
We have recently interpreted a similar right-to-consent provision in a partnership agreement relating to an LIHTC project.  See HRI, 479 Mass. 760-761.  In HRI, we concluded that, because consent was not required until a sale becomes "binding on the partnership," the partnership was not required to obtain the limited partner's consent to the preliminary steps preceding consummation of a sale.  Id. at 760-762.  These included listing the property, accepting the terms of an offer, and sending a disposition notice to the general partner for purposes of triggering the period during which it could exercise its right of first refusal.  Id.  Since none of those steps bound the partnership to a sale, it followed that the limited partner's consent was not required for them.  Id.
            We face a similar situation here.  Although the partnership received an offer from a bona fide third-party purchaser and sent a disposition notice to TDC, TDC in turn notified the partnership that it elected to exercise its right of first refusal at the debt plus taxes price, and MassHousing gave preliminary approval for a sale to TDC at that price, these preliminary steps towards a sale did not make the transaction binding on the partnership.  Accordingly, although the partnership could not consummate a sale without AMTAX's consent, AMTAX's consent was not required at or for any of these preliminary steps.  Id.  In this sense, the issue of AMTAX's consent is premature.  See Huntoon v. Quincy, 349 Mass. 9, 15 (1965) ("A premature action in contract may not be maintained"). 
            Regardless of prematurity, the question remains whether the consent right under article III(C) extends to sales pursuant to the right of first refusal.  Although article III(C) does not expressly exempt a sale pursuant to the ROR agreement from its scope, the judge concluded that it would lead to absurd results to include such a sale.  We agree.  As we have already explained, a central feature of the LIHTC program is to allow the investor limited partner to exit the partnership after the compliance period, once it has obtained the tax credits and is no longer subject to recapture, while allowing the qualified nonprofit sponsor to purchase the limited partner's interest at a below-market price of debt plus taxes pursuant to a right of first refusal.  See 26 U.S.C. § 42(j)(1) (limiting recapture period to compliance period); 26 U.S.C. § 42(i)(7) (contemplating right of first refusal and debt plus taxes price).  The parties contracted for this specific set of events in the partnership agreement, and gave each other an unconditional right to their respective benefit of the bargain:
"[AMTAX] shall have the option to force an offer to sell the [property] following the close of the [c]ompliance [p]eriod . . . .  In the event that [AMTAX] exercises [that] [o]ption, [TDII] shall have a right of first refusal to purchase the [p]roperty" (emphasis added).
 
Despite the unconditional nature of the reciprocal rights bargained for in the partnership agreement, AMTAX now asks that we interpret article III(C) to allow it to interpose its consent to any sale to TDC under the ROR agreement.  We have previously rejected this reading of the consent right because it would effectively prevent the nonprofit entity from purchasing the property at anything other than the market price.  HRI, 479 Mass. at 759.  Where the partnership agreement clearly reflects the parties' intention that TDC have an unconditioned right to exercise its right of first refusal in accordance with the terms of the ROR agreement and consistent with the LIHTC program, we see no reason to reach a different outcome here.  "An interpretation which gives a reasonable meaning to all of the provisions of a contract is to be preferred to one which leaves a part useless or inexplicable."  Sherman v. Employers' Liab. Assur. Corp., 343 Mass. 354, 357 (1961).  "[I]f we were to interpret [article III(C)] to require the consent of [AMTAX], [TDC] could be denied any meaningful opportunity to acquire the property interest at the [debt plus taxes] price."  HRI, 479 Mass. at 759.
            Finally, AMTAX argues that because the debt plus taxes price failed to include the limited partners' exit tax liability, AMTAX had the right to withhold consent to the terms of the sale.  This is in effect an argument over how the debt plus taxes purchase price was calculated, rather than an issue of consent.  But, however framed, the issue rises and falls on whether the limited partners' exit taxes are "attributable to" the sale.  We accordingly turn to that question next.
            2.  Taxes "attributable to" sale.  The ROR agreement gave TDC the right to purchase the property at the lesser of the price stated in the disposition notice (i.e., the price offered by the bona-fide third party purchaser) or "the sum of the principal amount of outstanding indebtedness secured by the [p]roperty . . . and all federal, state and local taxes attributable to such sale" (i.e., the debt plus taxes price). This language is identical to that contained in 26 U.S.C. § 42(i)(7)(B), and the parties agree that the ROR agreement was intended to mirror the statute.  
            At issue here is whether the limited partners' exit taxes are "attributable to" the sale of the property such that they are to be included in the debt plus taxes price.  Although the phrase "attributable to" is not defined either in the ROR agreement or in the statute, it is not ambiguous.  See Lumbermens Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995), citing Jefferson Ins. Co. v. Holyoke, 23 Mass. App. Ct. 472, 475 (1987) ("an ambiguity is not created simply because a controversy exists between the parties, each favoring an interpretation contrary to the other").  We accordingly construe the words "in their usual and ordinary sense."  Citation Ins. Co., v. Gomez, 426 Mass. 379, 381 (1998), quoting Hakim v. Massachusetts Insurers' Insolvency Fund, 424 Mass. 275, 280 (1997).
            In ordinary usage, the phrase "attributable to" means capable of being regarded as resulting from a specific cause.  See Webster's Third New International Dictionary 141-142 (1993) (meaning of "attributable" and of "attribute"); Random House Dictionary of the English Language 134 (2d ed. 1987) (same); 1 Oxford English Dictionary 556 (1978) ("attribute" means "to ascribe, impute, or refer, as an effect to the cause; to reckon as a consequence of").  Cf. In re HP Inkjet Printer Litig., 716 F.3d 1173, 1181 (9th Cir. 2013) ("'Attributable to' means 'to explain as caused or brought about by:  regard as occurring in consequence or on account of'").  More simply put, "attributable to" means caused by, due to, or generated by.  This is the meaning that other jurisdictions have given to the phrase when interpreting provisions of Title 26 of the Code of Federal Regulations, the title in which the provisions regarding the LIHTC program reside.  See Russian Recovery Fund Ltd. v. United States, 851 F.3d 1253, 1260 (Fed. Cir. 2017), quoting Electrolux Holdings, Inc. v. United States, 491 F.3d 1327, 1330 (Fed. Cir. 2007) (collecting cases) (construing "attributable to" for purposes of 26 U.S.C. § 6229[a] "according to its plain meaning, which is understood to be 'due to, caused by, or generated by'"); Goldberg v. Commissioner of Internal Revenue, T.C. Memo 2020-38, 119 T.C.M. (CCH) 1211 (T.C. 2020), aff'd, U.S. Ct. App., No. 20-2333 (7th Cir. Nov. 3, 2021) (using same definition for phrase "attributable to" in interpreting 26 U.S.C. § 6404[e][1]).  With that definition in mind, we turn to the question whether the limited partners' exit taxes[15] are attributable to the sale of the property or whether, as the plaintiffs argue, they are attributable either to the dissolution of the partnership or to the limited partners' presale tax decisions.
            We disagree with the plaintiffs' contention that the sale of the property and the dissolution of the partnership are sufficiently distinct events as to break the chain of causation between the sale of the property and the exit taxes.  The partnership agreement provides that the partnership "shall" be dissolved "upon" sale of the property.[16],[17]  The dissolution is mandatory, and subject to no condition other than the sale.  See Garcia v. Executive Office of Hous. & Livable Communities, 495 Mass. 86, 92 (2024) (mandatory obligation coupled with temporal restriction).  Moreover, because the partnership was a single-purpose entity having no purpose other than "to acquire, develop, conduct, rehabilitate, own, and lease" the property, it makes sense that the parties would have contemplated and agreed that the partnership would dissolve as a necessary and direct consequence of the sale.  Once the property is sold, there is no reason for the partnership to continue.
            We also disagree with the plaintiffs' argument that the limited partners' exit taxes are not attributable to the sale of the property because they are affected by various tax and debt decisions the partnership and the limited partners made over the years.  "Investors will face exit taxes on sale if the tax losses they have been allocated exceed their invested capital and if they have used those losses along the way to reduce their taxable income."  Khadduri et al., at 32.  "Investors most likely to face substantial exit tax liability are corporate investors who have used all of the tax losses and who have invested in properties where losses are particularly large because, in addition to depreciation, the properties have soft loans with large amounts of accruing interest."  Id.  But even accepting that the extent of the limited partners' exit tax liability will depend on various factors, the liability itself, as we have already explained, is triggered by the sale of the property.  Thus, the liability is "attributable to" the sale.
            Finally, the parties raise competing policy considerations regarding the consequence of including the limited partners' exit taxes in the debt plus taxes purchase price.  On the one hand, the plaintiffs argue that including the investors' exit taxes gives the investors more than what was contemplated by the LIHTC program, namely the tax credits, at the expense of the nonprofit general partner.  On the other hand, the defendants argue that saddling investors with their exit tax liability will reduce whatever benefit they received from the tax credits and therefore reduce the attractiveness of investing in properties under the LIHTC program.  Both policy arguments have some force.  However, our task is to interpret the unambiguous contract language as the parties negotiated it, without weighing whatever extrinsic competing policy considerations may flow from their chosen language -- especially as that language is based directly on 26 U.S.C. § 42(i)(7)(B), and therefore reflects Congress's evaluation of those competing considerations.[18]  See Decker v. Black & Decker Mfg. Co., 389 Mass. 35, 42 (1983) ("conflicting policy considerations are best resolved in the Legislature where the resolution can be based on full consideration of the competing interests").
            For the reasons set out above, the judge correctly allowed in part and denied in part the parties' competing declaratory judgment claims regarding the extent of AMTAX's consent right under the partnership agreement and the inclusion of the limited partners' exit taxes in the debt plus taxes price under the ROR agreement.  And because the counterclaims turned on the issue of consent, the judge also properly entered summary judgment in favor of the plaintiffs on the defendants' counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty and aiding and abetting breach of fiduciary duty, tortious interference with contract, and claim for violation of G. L. c. 93A.[19]  We turn to the plaintiffs' remaining claims. 
            3.  Remaining claims:  breach of contract, breach of implied covenant of good faith and fair dealing, tortious interference, slander of title, violation of G. L. c. 93A.  The plaintiffs' remaining claims rest on their allegations that, because AMTAX did not hold a consent right over the sale under the ROR agreement, Alden improperly recorded the notice of consent rights stating that AMTAX had "certain" consent rights:
"[AMTAX] has certain consent rights relating to the sale, assignment, or other disposition of the Property owned by the [partnership] and any and all transfers of title to or any interest in the subject Property are subject to and conditioned upon satisfaction of such consent rights. . . .  No consent has been provided by [AMTAX] as of the date of the recordation of this instrument for any transfer of the Property or any interest therein and any attempted transfer would be in violation of such consent rights."
The plaintiffs claim they have suffered damages due to the recording of the notice of consent rights because MassHousing withdrew its consent to the sale, and financing and development costs have risen during the resulting delay.  
            We begin by noting that the text of the notice of consent rights is accurate.  The notice of consent rights accurately stated that AMTAX had "certain" consent rights over the sale of the property and that it had not given its consent.  It does not identify what those consent rights were, nor does it state that AMTAX's consent right extended to sales under the ROR agreement.  Recording the notice of consent rights gave constructive notice of the existence of AMTAX's consent right without defining its extent.  Cf. Bank of Am., N.A. v. Casey, 474 Mass. 556, 561 (2016) (recording of mortgage gives constructive notice of its existence).
            With this background in hand, we turn to the plaintiffs' various claims.  To prevail on their breach of contract claim, the plaintiffs must show:  "(1) an agreement was made between the plaintiffs and the defendant supported by valid consideration; (2) the plaintiffs have been ready, willing, and able to perform; (3) the defendant's breach has prevented them from performing; and (4) the plaintiffs have suffered damage" (citations omitted).  Singarella v. Boston, 342 Mass. 385, 387 (1961).  See Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 690 (2016).  The plaintiffs claim that the defendants committed a breach of the partnership agreement when Alden recorded the notice of consent rights, blocking the sale to TDC, because limited partners are prohibited from exercising control over the business of the partnership.[20]  The claim fails because the plaintiffs failed to raise a triable issue of damages.  The plaintiffs were not entitled to purchase the property for the sale price they proposed when they exercised their right of first refusal because that price did not include the limited partners' exit taxes.  Because TDC was not entitled to purchase the property at an incorrect price, the plaintiffs were not damaged by the recording of the notice of consent rights. 
            The plaintiffs' claim for breach of the implied covenant of good faith and fair dealing fails for the same reason.  All contracts contain an implied covenant of good faith and fair dealing.  Robert & Ardis James Found. v. Meyers, 474 Mass. 181, 188 (2016).  The implied covenant provides "that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  Id. at 189, quoting Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471-472 (1991).  A breach of the implied covenant of good faith and fair dealing arises where one party "violates the reasonable expectations of the other."  Chokel v. Genzyme Corp., 449 Mass. 272, 276 (2007).  To prevail on the claim, the plaintiffs must demonstrate that the recording of the notice of consent rights "destroy[ed] or "injur[ed]" the plaintiffs' ability to receive a benefit under the contract.  Robert & Ardis James Found., 474 Mass. at 189.  See Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 388, cert. denied sub nom. Globe Newspaper Co. v. Ayash, 546 U.S. 927 (2005) (plaintiff failed to introduce evidence of compensable loss as result of conduct).  Again, TDC did not have a protectable interest in buying the property at an incorrect price, and the plaintiffs could not be damaged simply because TDC was prevented from doing so.
            The plaintiffs' claim for tortious interference fails for exactly the same reason.  To establish tortious interference, a party must prove "that (1) he had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions."  Blackstone v. Cashman, 448 Mass. 255, 260 (2007).  As we have said, no damages were caused by interfering with the proposed sale under the ROR agreement because it was based on an incorrect price. 
            Slander of title is, together with trade libel, part of the tort of "injurious falsehood."  Restatement (Second) of Torts § 623A (1977).  Title slander is a particular type of injurious falsehood involving the "disparagement of the property in land, chattels, or intangible things."  Restatement (Second) of Torts § 624 comment.  In order to prevail on a claim for injurious falsehood a party must show that the defendant "(a) . . . intends for publication of the statement to result in harm to the interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity."  Dulgarian v. Stone, 420 Mass. 843, 852 (1995), quoting Restatement (Second) of Torts § 623A.  In Dulgarian, we concluded that summary judgment for the defendants was appropriate where the plaintiff failed to put forth any evidence demonstrating that the defendants knew or should have known that the statement was false.  Dulgarian, 420 Mass. at 852.  Here, there was even less to support the claim than in Dulgarian because the notice of consent rights was not false.  AMTAX did indeed have "certain" consent rights under article III(C) of the partnership agreement and it had in fact failed to consent to any sale at the time the notice was recorded.  
            Finally, because the plaintiffs' G. L. c. 93A claim is derivative of their slander of title and tortious interference claims, it fails for the same reasons they do.  See Park Drive Towing, Inc. v. Revere, 442 Mass. 80, 85-86 (2004) (where G. L. c. 93A claim is derivative of another claim that fails, so too must G. L. c. 93A claim fail). 
Conclusion.  For the reasons set out above, the judgment is affirmed.
So ordered.
footnotes

            [1] Tenants' Development II Corporation.
            [2] Alden Torch Financial LLC and Tax Credit Holdings III, LLC.
            [3] We acknowledge the amicus briefs submitted by the Executive Office of Housing and Livable Communities, the Community Economic Development Assistance Corporation, the city of Boston, and the Massachusetts Housing Partnership Fund Board; The Community Builders, Inc., the Council of Large Public Housing Authorities, Homeowner's Rehab., Inc., Preservation of Affordable Housing, Inc., 2Life Communities Inc., National  Housing Trust, LeadingAge, Stewards of Affordable Housing for the Future, The Brockmann Law Firm, P.C., Goldstein Hall PLLC, Gubb & Barshay LLP, Blanco Tackabery & Matamoros, P.A., Regional Housing Legal Services, Community Development Network of Maryland, Incorporated, Housing Association of Nonprofit Developers (HAND), RRozen Associates, National Housing Law Project, and The Local Development Corporation of Crown Heights, Inc.; and the Washington State Housing Finance Commission. 
            [4] "Qualified nonprofit organization" refers to "any organization if . . . (i) such organization is described in paragraph (3) or (4) of section 501(c) and is exempt from tax under section 501(a), (ii) such organization is determined by the State housing credit agency not to be affiliated with or controlled by a for-profit organization, and (iii) 1 of the exempt purposes of such organization includes the fostering of low-income housing."  26 U.S.C. § 42(h)(5)(C).
            [5] The program was amended to extend the compliance period by fifteen years for projects beginning in 1990 or later (the "extended use period"), and thus rent affordability restrictions are now generally in place for a total of thirty years, although recapture of tax credits can only occur at the close of the compliance period.  26 U.S.C. § 42(h)(6).
            [6] The amount of equity a limited partner is willing to invest in this context tends to be greater than what would be justified by the cash flow or resale value of the property alone, because the investors also receive the annual benefit of reducing their tax liability for a ten-year period.  Khadduri et al., at 24. 
            [7] The Mitchell-Danforth task force was formed in 1988 and directed to, among other things, review the LIHTC program for possible improvements.  Mitchell–Danforth Report, at 1.  The report suggested that Congress create a unique ability for nonprofits to purchase the LIHTC properties at a below-market rate at the end of the compliance period.  Id. at 19.  This suggestion was driven by the goal of maintaining the supply of affordable housing.  Id. at 4, 19.
            [8] Holders of a right of first refusal may be treated as the actual owner for tax purposes under the economic substance doctrine articulated in Frank Lyon Co. v. United States, 435 U.S. 561, 572-573 (1978).  See 26 C.F.R. § 1.42–4(b) (2017) (suggesting that 26 U.S.C. § 42 may be limited or disallowed under other provisions of tax code or principles of tax law, including economic substance doctrine).  The doctrine looks at the "economic realities" of a transaction to ascertain the owner for tax purposes.  Frank Lyon Co., 435 U.S. at 573.  A holder of a right of first refusal that can be exercised at below market price may render the holder the true owner for tax purposes.  HRI, 479 Mass. at 754.  Therefore, absent the language in § 42(i)(7)(A), it is possible that the nonprofit would be deemed the property's owner and hence the entity eligible to take advantage of the tax credits and claim depreciation deductions.  See id.  This outcome would run counter to the LIHTC program purpose of using the credits to attract investors to provide equity for the project.  Khadduri et al., at 25.  
            [9] The property consists of 185 residential units on thirty-six parcels of land throughout the South End section of Boston.
            [10] TDC was simultaneously removed as a limited partner.
            [11] This number was reached by taking the amount in AMTAX's capital account, as represented on the partnership's tax return, adding the projected losses or income for the year to estimate the projected capital account amount at the anticipated date of sale, and then multiplying that total amount by the corporate tax rate at the time.
            [12] The notice of consent rights stated:  "[AMTAX] has certain consent rights relating to the sale, assignment, or other disposition of the Property owned by the [partnership] and any and all transfers of title to or any interest in the subject Property are subject to and conditioned upon satisfaction of such consent rights. . . .  No consent has been provided by [AMTAX] as of the date of the recordation of this instrument for any transfer of the Property or any interest therein and any attempted transfer would be in violation of such consent rights."
            [13] To the extent that the plaintiffs argue that the price provision in the ROR agreement is ambiguous, that argument is waived as it was not raised below.  See Carey v. New England Organ Bank, 446 Mass. 270, 285 (2006) ("issue not raised or argued below may not be argued for the first time on appeal" [citation omitted]). 
            [14] Section 4.5(A)(iii) of the partnership agreement outlines certain rights of the investor limited partner, including that "[AMTAX] shall have the right . . . to approve or disapprove the sale of all or substantially all of the assets of the [p]artnership, which approval shall not be unreasonably withheld."  AMTAX does not -- nor could it -- contend that it would be reasonable for it to withhold consent to TDC buying the property at the debt plus taxes price.  
            [15] In HRI, we used the term "exit tax liability" as a shorthand for "all Federal, State and local taxes" as used in the ROR agreement.  HRI, 479 Mass. at 745 n.5.  It was not used in the sense implicated here, which is the exit tax liability of the limited partners.
            [16] Section 2.5 of the partnership agreement provides that the partnership "shall be dissolved . . . upon the happening of . . . the sale or other disposition of all or substantially all the assets of the [p]artnership."
            [17] In turn, a partner's interest liquidates:  "upon the earlier of (1) the date upon which there is a liquidation of the partnership, or (2) the date upon which there is a liquidation of the partner's interest in the partnership . . . .  For purposes of this paragraph, the liquidation of a partnership occurs upon the earlier of (3) the date upon which the partnership is terminated . . . or (4) the date upon which the partnership ceases to be a going concern (even though it may continue in existence for the purpose of winding up its affairs, paying its debts, and distributing any remaining balance to its partners)."  26 C.F.R. § 1.704-1(b)(2)(ii)(g).
            [18] Although we do not rest any aspect of our decision on this fact, we note that multiple bills have been introduced, but not passed, that would, among other things, remove limited partners' exit taxes from the debt plus taxes price under § 42(i)(7)(B).  See, e.g., Decent, Affordable, Safe Housing for All Act, H.R. 6970, 118th Cong., 2d Sess., § 2 (2024); Affordable Housing Credit Improvement Act, S.B. 1703, 116th Cong., 1st Sess., § 303 (2019).  
            [19] As originally pleaded, the defendants' counterclaims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and violation of G. L. c. 93A also rested on the allegations that the plaintiffs failed to disclose the ROR agreement and conducted a "sham marketing process for the sole purpose of obtaining a straw offer."  The defendants no longer press either theory of these claims on the appeal.
            [20] Section 7.3(A) of the partnership agreement provides that "[t]he [g]eneral [p]artners shall have the exclusive right to manage the business of the [p]artnership."